IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| UNITED STATES OF AMERICA | |
|---|---|
| Plaintiff, | Case No. CR 10-110-S-BLW |
| v. | **MEMORANDUM DECISION AND ORDER** |
| SEAN PAUL BOLIVAR | |
| Defendant. | |

## INTRODUCTION

The Court has before it two motions to suppress filed by defendant Bolivar. The Court held an evidentiary hearing on November 10, 2010, and took the motions under advisement. For the reasons explained below, the Court will deny the motion to suppress the firearm, and will grant the motion to suppress Bolivar's confession.

## SUMMARY

In the course of a search of an apartment shared by Bolivar and Philine Black, the police found the sawed-off shotgun that forms the basis for the charges in this case. Bolivar claims that the search violated his Fourth Amendment rights. The police respond that the gun was discovered during a valid probation search following Black's arrest on a probation violation warrant. The Court agrees that the search was proper and will deny the motion to suppress the weapon.

After finding the shotgun, the police questioned Bolivar and he admitted

**Memorandum Decision & Order - 1**

ownership of the weapon. Bolivar claims that his confession should be suppressed because he was not given the full *Miranda* warning as required. The Court finds that the *Miranda* warning was deficient and requires suppression of the confession.

## FACTUAL BACKGROUND

On January 20, 2010, Philine Black was convicted of frequenting a place where controlled substances are used, a misdemeanor under Idaho Code § 37-2732(d). She was placed on probation for a term of six months. As part of her probation, she agreed that she would "consent to the search of my person, automobile, real property and any other property at any time at any place by any probation officer or any police officer and waive my constitutional right to be free from such searches." *See Probation Agreement, Dkt. 23-1*.

On March 18, 2010, a petition of probation violation was filed alleging that Black violated her probation by (1) admitting to using methamphetamine and marijuana during the month of March; (2) failing to complete eight hours of work detail by February 26, 2010; and (3) missing eleven scheduled drug tests. On March 25, 2010, Twin Falls Police Officers Silvester and Trump assisted Jamie Staples, Black's probation officer, in serving an arrest warrant on Black at the apartment she shared with Bolivar. Both Black and Bolivar signed the lease agreement as tenants. *See Lease, Dkt. 18-7*.

When the officers arrived at the apartment, Black let them in. *See Trump Affidavit, Dkt. 18-4* at 1. Bolivar was not present, as he was incarcerated at the Twin Falls County Jail.

**Memorandum Decision & Order - 2**

The officers arrested Black on her probation violation warrant, and conducted a search of the apartment. During his testimony at the suppression hearing, Officer Silvester gave varied testimony on whether Probation Officer Staples had told him prior to the search that Bolivar resided in the apartment with Black. The one consistent element of his testimony on this issue was that he remembered little, and that was confirmed by his inconsistent attempts to recall what happened. For example, he testified early-on in cross examination that Staples may have informed him that Bolivar resided in Black's apartment. Then, in response to the Court's questions, he testified that Staples did not so inform him. That about-face prompted defense counsel to ask follow-up questions that elicited his testimony that it was possible Staples told him but not probable. These different accounts confirm Officer Silvester's initial testimony that he did not have – as he sat there on the stand – a good recollection of what Staples told him.

His memory was sharper six months earlier during his grand jury testimony. *See Exhibit L.* There, he testified as follows:

> The probation officer asked me if I would help her search Ms. Black's residence. I learned at that time that Mr. Bolivar was Ms. Black's boyfriend and that he had also been living in that apartment.

*Id*. at p. 3. This testimony suggests that Probation Officer Staples told Officer Silvester – before the search of Black's apartment began – that Bolivar resided with Black. However, there is some ambiguity even in that statement. Testifying that he learned "at that time" that Bolivar resided at the apartment, Silvester could be referring to the time when the probation officer asked him to help in the search or it could refer to the time

**Memorandum Decision & Order - 3**

when the search was undertaken.  This latter interpretation is consistent with Silvester's recorded statements during the search when he seems to indicate that he is not aware that Black has a roommate.  However, for purposes of this motion, the Court will assume that Silvester knew that Bolivar was a resident of the apartment before the search began.

The apartment had a single bedroom, used by Black.  In that bedroom, on the night stand beside Black's bed, officers found a marijuana pipe containing burnt residue.  Officer Trump tested the residue and found that it tested positive for marijuana.  *Id.*  Black admitted that the drug paraphernalia was hers.  *Id.*

Along the left wall of that bedroom were two closet doors about 3 to 4 feet apart.  *See Exhibit M*.  In the course of his search in that bedroom, Officer Silvester opened the closet door on the right.  The interior closet space was not divided, but there was a distinct break or space between clothing hanging on the right side and clothing hanging on the left side.  Officer Silvester recalled seeing men's and women's clothing "not mixed together," but he could not recall on which side of the closet each was kept.  On cross examination, he testified that it was possible that the men's clothing was on the right side.  Defendant Bolivar testified that his clothes were kept in the right half of the closet while Black's clothes were kept on the left side.  The Court finds that Officer Silvester, upon opening the right closet door, encountered only men's clothes.

After opening the right side closet door, Officer Silvester saw a purple backpack hanging from a hanger in the middle of the closet.  He testified that he could just reach in and grab it, and did not have to crawl in through the closet to reach it.  The backpack was

**Memorandum Decision & Order - 4**

zippered shut with no protrusions.

At this time, Officer Silvester was wearing a microphone and recorder that picked up his conversations during the search. A portion of that recording, beginning with Officer Silvester's discovery of the backpack and his subsequent questioning of Black, is transcribed as follows:

Officer: Philine, what's in this backpack?

Black: (Inaudible) I don't know

Officer: Is this yours?

Black: Huh-uh.

Officer: Well, you're the only one that lives here, aren't you?

Black: No.

Officer: Who else lives here?

Black: Sean Paul.

Officer: It's his backpack?

Black: Yeah.

Officer: Okay. Okay. Stay back.

Officer: Like a sawed-off rifle or something.

*See Exhibit H* at 5.

At some point in this exchange, Officer Silvester opened the backpack and found a .12 gauge sawed-off shotgun with a ten-inch barrel. *See Exhibit B.* That is the firearm that forms the basis for the charges in this case.

**Memorandum Decision & Order - 5**

Officer Silvester testified that he had already opened the backpack and discovered the weapon when he asked Black "what's in this backpack?" Bolivar takes issue with this, pointing out that on the audio CD, a distinctive zipper sound can be heard only after Black denies ownership of the backpack. *See Exhibit G (Audio CD - Track 1 at 5 minutes 55 seconds).* Bolivar assumes the zipper sound comes from Officer Silvester opening the backpack for the first time.

The zipper sound comes after Black denies ownership of the backpack but before she tells Officer Silvester that its owner is Bolivar. *Id.* It is not clear whether the zipper is being opened or closed, or whether it is the zipper on the backpack. *Id.* Before Officer Silvester begins his questioning of Black there are some less distinct zipper sounds where he might be opening the backpack as he testified although that is by no means certain. *Id.* The audio CD is simply not sufficiently clear to discredit the unequivocal testimony of Officer Silvester that he opened the backpack before questioning Black.

Officer Trump states that Black told him the gun "belonged to her boyfriend, Sean Bolivar." *See Exhibit A*. The Officers took Black to the Twin Falls County Jail on her arrest warrant, and then met with Bolivar who was incarcerated there. While he initially denied any knowledge of the sawed-off shotgun, he later admitted that it belonged to him. *Id.* The Government charged Bolivar with (1) possession of an unregistered firearm, and (2) unlawful possession of a firearm.

Bolivar's motion to suppress argues that the gun was improperly seized and should be suppressed. He also argues that his statements at the jail were the fruit of that

**Memorandum Decision & Order - 6**

improper search and should be likewise suppressed. Finally, he filed a separate motion alleging that his statements should be suppressed because he was not given a proper *Miranda* warning.

## ANALYSIS

### Motion to Suppress Firearm

The warrantless search of a home is presumptively unreasonable unless the government can prove consent or that the search falls within one of the carefully defined sets of exceptions. *See Arizona v. Hicks,* 480 U.S. 321, 327 (1987). One such exception applies for searches conducted immediately following a home arrest. *See U.S. v. Lemus*, 582 F.3d 958 (9th Cir. 2009). Arresting officers are permitted in such circumstances "to take reasonable steps to ensure their safety after, and while making, the arrest." *Id*. at 962. The Government does not allege that this exception applies here, and so the Court will not discuss it further.

The Government invokes a different exception that applies "[w]hen an officer has reasonable suspicion that a probationer subject to a search condition is engaged in criminal activity." *See U.S. v. Knights*, 534 U.S. 112, 121 (2001). Here, Black was on probation, was subject to an arrest warrant for violating that probation, and was arrested in her apartment with her drug pipe and marijuana residue in plain view. She had, as a condition of her probation, given consent to a search of her apartment. The actual search, looking for evidence of illegal drug use, was closely aligned with her arrest for a probation violation that involved alleged illegal drug use. Under these circumstances, the

**Memorandum Decision & Order - 7**

officers had the right to conduct a warrantless search of Black's apartment in connection with her arrest on the probation violation warrant.

Bolivar, however, gave no such express consent to the search of his belongings in the apartment he shared with Black. While Black could give consent to search the "common areas" of the apartment she shared with Bolivar, *U.S. v. Matlock*, 415 U.S. 164(1974), Bolivar retained rights to his own belongings. *See* 4 LaFave*, Search & Seizure,* § 8.3(g) (4th ed. 2005) at 167 ("the notion that persons sharing premises generally might nonetheless maintain certain mutually exclusive zones of privacy is a sound one and is totally consistent with the underlying rationale of *Matlock*").

A question remains, however, whether Bolivar gave his implied consent to a search of his belongings if he knew that Black was a probationer who had consented to a broad probation search. Bolivar testified that while he knew Black was a probationer, he did not know she had waived her Fourth Amendment rights. The Government did not pursue an implied consent argument, and so the Court need not confront the issue in this decision. Nevertheless, the Court is skeptical that simply living with a probationer – even knowing she has signed a broad Fourth Amendment waiver – would constitute an implied "consent" on behalf of the non-probationer. *See generally*, *People v. Baker*, 79 Cal. Rptr. 3d 858 (Cal.Ct.App. 2008) ("[w]hile those who associate with parolees or probationers must assume the risk that when they share ownership or possession with a parolee or probationer their privacy in these items might be violated, they do not abdicate all expectations of privacy in all personal property").

**Memorandum Decision & Order - 8**

To strike the proper balance between Bolivar's legitimate privacy rights and Black's broad waiver of her Fourth Amendment rights, Bolivar argues that the police must "have probable cause to believe that what they intend to search actually belongs, or is connected, to the parolee." *Motley v. Parks*, 432 F.3d 1072, 1087 (9th Cir. 2005) (en banc). The Government responds that the proper standard is one of reasonable suspicion, and cite as support *U.S. v. Davis*, 932 F.2d 752, 758 (9th Cir. 1991) (holding that "police must have reasonable suspicion, that an item to be searched is owned, controlled, or possessed by probationer, in order for the item to fall within the permissible bounds of a probation search").

The Court finds that *Davis* rather than *Motley* governs this case. *Davis* considered the very issue faced here – whether the search of a probationer's residence could include a search of the belongings of a third person located in the probationer's bedroom. After reviewing the case-law on this specific issue, *Davis* adopted the reasonable suspicion standard.

*Motley*, on the other hand, was a § 1983 action holding that (1) police need probable cause to believe a probationer resides at the house to be searched and (2) the police were entitled to qualified immunity because the law was not clearly established at the time of the search that any suspicion of wrong doing on the part of the probationer was needed to justify a search. *Motley*, 432 F.3d at 1075. While *Motley* discussed *Davis*, it was in the context of determining whether the law was clearly established at the time of the search for qualified immunity purposes under § 1983. *Motley* never attempted to

**Memorandum Decision & Order - 9**

analyze the *Davis* holding or to modify it in any way. For all of these reasons, the Court finds that *Davis* is the controlling case. Accordingly, the Court will use the reasonable suspicion test.

Reasonable suspicion "is formed by specific, articulable facts which, together with objective and reasonable inferences, form the basis for suspecting that the particular person detained is engaged in criminal activity." *U.S. v. Burkett*, 612 F.3d 1103, 1107 (9th Cir. 2010). When determining whether reasonable suspicion exists, courts must review the "totality of the circumstances" to ascertain whether the officer had "some minimal level of objective justification" to suspect legal wrongdoing. *Id.* This review "must be based on commonsense judgments and inferences about human behavior." *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000). While requiring more than a "hunch," *Terry v. Ohio*, 392 U.S. 1, 27 (1968), it requires "considerably less than proof of wrongdoing by a preponderance of the evidence," and falls below the probable cause standard of "a fair probability that contraband or evidence of a crime will be found." *U.S. v. Sokolow*, 490 U.S. 1, 7 (1989).

In *Davis*, the police found incriminating evidence against Davis while conducting a valid probation search of probationer Andrews' apartment. Davis argued that even if the probation search was proper, the police exceeded its proper scope by searching through the contents of a safe that belonged to him, located in Andrews' apartment. Davis pointed out that the police had obtained the safe's combination from him earlier in the day so that they knew the safe belonged to him. *Id.* at 759. Balanced against that,

Memorandum Decision & Order - 10

however, was evidence of a drug conspiracy between Davis and Andrews and the safe being located in Andrews' bedroom. *Id.* These facts, the Circuit held, led police to reasonably suspect that the safe was jointly owned, possessed or controlled by Andrews and Davis, and hence the scope of the probation search properly extended to the safe. *Id.* The Circuit noted that even if the probationer had "strenuously denied ownership of the [item searched] . . ., the police still could have reasonably suspected the [item searched] was within her custody or control." *Id*. at 759 n.6.

In the present case, the Court must examine whether Officer Silvester had a reasonable suspicion that the backpack was owned, controlled, or possessed by Black. Before beginning his search, Officer Silvester knew that Bolivar resided in the apartment with Black. When Officer Silvester entered the right-side door of the closet, he encountered only men's clothes. While the backpack was hanging in the middle of the closet, it was easily accessible from the right side of the closet according to Officer Silvester's testimony, indicating that perhaps the male resident – Bolivar – hung the backpack there.

At the same time, the backpack was found in the middle of the interior of the undivided closet, indicating that it could have been placed there by Black, and also indicating it might be jointly controlled by Black and Bolivar. *See Davis,* 932 F.2d at 759 (upholding probation search of safe found in probationer's bedroom because "police could have reasonably suspected the safe was jointly owned, possessed, or controlled by [defendant] and probationer"). The Circuit in *Davis* held that "[r]easonable suspicion that

Memorandum Decision & Order - 11

an item is owned, possessed, or controlled by the probationer may exist even in circumstances when the item to be searched is not obviously and undeniably owned, possessed, or controlled by the probationer." *Id*. at 760. That is the case here. While it cannot be said that Black undeniably controlled the backpack, its placement in the middle of the closet indicated that she might share control with Bolivar.

The Circuit in *Davis* also cited *U.S. v. Giannetta*, 909 F.2d 571 (9th Cir. 1990) for its holding that upon discovering incriminating material, the probation officer "was justified in expanding the scope of the his probation search" to look for related matters. The same analysis applies here. The police had discovered marijuana and a smoking pipe in the bedroom, and so could expand the scope of their probation search to look for drugs. The backpack was a likely spot to hide drugs. The significant discovery of contraband in the apartment justified Officer Silvester's reasonable suspicion that the backpack, hanging in an area that could be jointly controlled by Black and Bolivar, could be a hiding spot for more contraband. *See Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) (officers are "not required to ignore the relevant characteristics of a location" in forming reasonable suspicion).

Officer Silvester needed more than a "hunch" that the backpack was controlled by Black but less than probable cause that it belonged to her. The totality of the circumstances show that Officer Silvester had a reasonable suspicion that the backpack was controlled by Black or jointly controlled by Black and Bolivar.

The Court therefore rejects Bolivar's argument that the backpack was improperly

seized. The Court turns next to Bolivar's claim that his statements must be suppressed.

**<u>Motion to Suppress Statements</u>**

Bolivar argues that his responses to police questioning at the Twin Falls Jail on March 25, 2010, must be suppressed because he was not given the full warning required by *Miranda v. Arizona*, 384 U.S. 436 (1966). His statements were the result of a custodial interrogation that required compliance with *Miranda*. The interrogation was captured on tape, and that portion where Bolivar is given his *Miranda* warning goes as follows:

| | |
|---|---|
| Police Officer: | We were just over here at your apartment over on Washington but before I ask you any questions about anything, I just want – do you know what your rights are? I'm sure you've heard what your rights are before, right, your Miranda rights? You have the right to remain silent. All that stuff. Anything you say can and will be used against you in a court of law. If you want a lawyer, you can have one present during questioning. If you can't afford one, one will be provided to you – |
| Bolivar: | Okay. |
| Police Officer: | – at no cost to you. Do you understand all that? |
| Bolivar: | Yeah. |

*See Exhibit J*. No further warnings were conveyed to Bolivar before questioning began or during the questioning.

Bolivar claims that this warning did not advise him of his right to consult an attorney *before* questioning began. *Miranda* prescribed the following four now-familiar warnings:

> [A suspect] must be warned prior to any questioning (1) that he has the right to remain silent, (2) that anything he says can be used against him in a court of law, (3) that he has the right to the presence of an attorney, and (4) that if he cannot afford an attorney one will be appointed for him prior to any

**Memorandum Decision & Order - 13**

questioning if he so desires.

*Id*. at 479. These four warnings "are invariable," but the words used may be varied so long as the "essential information is conveyed." *Florida v. Powell*, 130 S.Ct. 1195, 1204 (2010). In determining whether police officers adequately conveyed the four warnings, this Court is not required to examine the words employed "as if construing a will or defining the terms of an easement. The inquiry is simply whether the warnings reasonably conve[y] to [a suspect] his rights as required by Miranda." *Id*. (quoting *Duckworth v. Eagan*, 492 U.S. 195, 201(1989)).

Bolivar points out that he was not told that he had the right to consult with an attorney before questioning began. The Supreme Court has held that *Miranda* requires "the suspect be informed . . . that he has the right to an attorney *before and during* questioning . . ." *Duckworth,* 492 U.S. at 204 (emphasis added). The Ninth Circuit has followed that precedent: "In order to be valid, a Miranda warning must convey clearly to the arrested party that he or she possesses the right to have an attorney present *prior to and during* questioning." *U.S. v. San Juan-Cruz*, 314 F.3d 384, 388 (9th Cir. 2002) (emphasis added). The *Juan-Cruz* case went on to hold that "[a] confession that is made by an individual . . . absent the knowledge that he or she possesses the right to have an attorney present *prior to and during* questioning is unreliable and may not be admitted at trial." *Id*. at 389 (emphasis added).

The failure to explicitly give this notice can be cured, however, if the entire *Miranda* warning essentially conveys that message. For example, in *Powell* the Supreme Court reviewed a notice that failed to explicitly notify defendant that he had the right to consult an attorney

**Memorandum Decision & Order - 14**

during questioning (although it warned of the right to consult before questioning).[1] *Powell* held that the lack of an explicit notice on that issue was cured by the essential message conveyed by the entire *Miranda* warning:

> [The officers] informed [the defendant] Powell that he had "the right to talk to a lawyer before answering any of [their] questions" and "the right to use any of [his] rights at any time [he] want[ed] during th[e] interview." The first statement communicated that Powell could consult with a lawyer before answering any particular question, and the second statement confirmed that he could exercise that right while the interrogation was underway. In combination, the two warnings reasonably conveyed Powell's right to have an attorney present, not only at the outset of interrogation, but at all times.

*Id*. at 1204-05. The Ninth Circuit similarly looked at the entire warning given in rejecting a *Miranda* challenge in *People of Territory of Guam v. Snaer*, 758 F.2d 1341 (9th Cir. 1985). There, the Circuit encountered a *Miranda* warning that – like the warning in this case – failed to expressly state that the defendant had the right to consult with a lawyer "before questioning" or " prior to questioning." *Id*. at 1343. The warning only stated that "[y]ou have a right to consult with a lawyer and to have a lawyer present with you while you are being questioned." *Id*. The Circuit held that "the first part of that sentence read in the context of the latter half of the sentence does adequately convey notice of the right to consult with an attorney before questioning." *Id*.

Both *Powell* and *Snaer* (1) required notice that the defendant had a right to consult

---

[1] The full warning in *Powell* went as follows: "You have the right to remain silent. If you give up the right to remain silent, anything you say can be used against you in court. You have the right to talk to a lawyer before answering any of our questions. If you cannot afford to hire a lawyer, one will be appointed for you without cost and before any questioning. You have the right to use any of these rights at any time you want during this interview." *Powell*, 130 S.Ct. at 1200.

**Memorandum Decision & Order - 15**

with an attorney prior to and during questioning, and (2) held that the lack of explicit notice could be cured if the entire *Miranda* warning essentially conveyed that message. The absence of the latter is fatal. In *U.S. v. Bland*, 908 F.2d 471, 473-74 (9th Cir. 1990), the Circuit found a *Miranda* violation, and suppressed a confession, when a defendant was advised of his right to consult an attorney before questioning began but was told nothing about his right to consult an attorney during questioning. The court did not discuss or identify any "saving" language that could cure the omission.

In the present case, the interrogator completely omitted any reference to Bolivar's right to consult with an attorney *before* questioning. Bolivar was told only that he "can have [an attorney] present during questioning." Reviewing the entire warning, there is no other part that could be read "in context" with this part to cure the omission, as was done in *Powell* and *Snaer*. The importance of this omission was stressed in *Snaer*:

> The right to consult with an attorney before questioning is significant because counsel can advise the client whether to exercise his right to remain completely silent, or, if he chooses to speak, which questions to answer or how to answer them. Thus, it is extremely important that a defendant be adequately warned of this right.

*Id*.

Because Bolivar was not given notice that he had a right to consult with an attorney before questioning began, the Court will grant the motion to suppress to the extent it seeks to exclude the use of Bolivar's statements in the Government's case-in-chief. *See Dickerson v. United States,* 530 U.S. 428, 443-444 (2000) (holding that the "core ruling" of *Miranda* was that "unwarned statements may not be used as evidence in

**Memorandum Decision & Order - 16**

the prosecution's case in chief"). The statements remain admissible for impeachment purposes. *Harris v. New York,* 401 U.S. 222 (1971).

**ORDER**

In accordance with the Memorandum Decision set forth above,

NOW THEREFORE IT IS HEREBY ORDERED, that the motion to suppress the firearm (docket no. 18) is DENIED.

IT IS FURTHER ORDERED, that the motion to suppress based on *Miranda* violation (docket no. 24) is GRANTED to exclude from the Government's case-in-chief the use of any statements of defendant Bolivar elicited in response to questioning on March 25, 2010 at the Twin Falls Jail.



DATED: **November 20, 2010**

Honorable B. Lynn Winmill
Chief U. S. District Judge